UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

PATRICK JASNIAK
    Plaintiff,

v.                      Case No.: 3:24-cv-454-MMH-LLL

AARON ARNETTE, et al.,
    Defendants.
_____/

PLAINTIFF'S RESPONSE IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Introduction:

    This filing opposes Defendant's motion for summary judgment. The record contains multiple genuine disputes of material fact regarding sexual assault, excessive force, retaliation, deliberate indifference to medical needs, due process violation, and destruction of evidence, when the evidence is viewed in the light most favorable to plaintiff, as required under Rule 56, a reasonable jury could find in plaintiff's favor on each claim.

Legal standard:

    Summary judgment is proper only when the moving party shows that no genuine dispute of material fact exists and that is entitled to judgment as a matter of law. All evidence must be viewed in the light most favorable to the non moving party, and all reasonable inferences must be drawn in the party's favor. Credibility determinations, weighing of evidence, and resolutions of factual disputes are for the jury, not the courts at this stage.

Statement of disputed facts:

    Defendant's motion relies on a version of events that is contradicted by plaintiff's sworn declaration grievances, medical records, and supporting exhibits. Material factual disputes include:

    1. Defendants argue: Plaintiff was causing a disturbance after midnight by yelling, screaming, kicking the cell door, and banging an unknown object.

    Plaintiff's response: Plaintiff was asleep and woken up by Officer Hunt banging on his cell door at around 1:30 A.M. and telling plaintiff "to get his ass up and to strip and bend over."

Due to the Defendant's aggressive manner, threats, and retaliatory actions plaintiff was in fear and requested to speak and see the Lieutenant on duty.

The evidence shows: The video evidence submitted by the defendants starts at 1:59 A.M. which only shows when chemical agents are about to be deployed on plaintiff and any other event thereafter. The video evidence does not include any of the events leading up to the disturbance or the circumstances that preceeded the use of chemical agents.

Supporting Exhibits: Exh. 5 fixed wing video is timed stamped 1:59 A.M. which is almost 2 hours after Defendants alleged plaintiff was causing a disturbance after midnight. Exhibits 1-4 have no time or date displayed and recording starts just seconds prior to deploying chemical agents. Exhibits 1-4 also have undisclosed missing video.

Why this creates a factual dispute: This creates a factual dispute because Defendants version of events and plaintiff's version of events completely contradict each other. The Defendants did not provide video evidence of the alleged disturbance after midnight or what led to it, they provided video evidence they wanted to and withheld the rest.

2. Defendants argue: Video one cuts because of full memory card, but fixed wing camera (fixed wing one) shows that nothing occurred during this time.

Plaintiff's response: There is undisclosed missing video recording on handheld camera throughout Exh. 1-2 incident and fixed wing camera (fixed wing one) does not catch what's missing on handheld because view is blurry and not clear. Fixed wing camera also does not catch view of inside plaintiff's cell and there is no way to determine how much or when handheld video is missing video.

The evidence shows: The fixed wing camera (fixed wing one) does not show a clear view of plaintiffs  cell side front and there is undisclosed missing or erased video time of handheld camera and impossible to determine when or what is exactly missing.

Supporting exhibits: Exhibits 1-2 have undisclosed missing video and fixed wing video Exhibit 5 does not catch what's missing because view of plaintiffs cell front is not clear and fixed wing does not view inside of plaintiffs cell.

Why this creates a factual dispute: There is  undisclosed missing or withheld video which is critical evidence that shows some of plaintiff's version of events.

3. Defendants argue: Plaintiff did not fully comply with strip search procedures during all three applications of chemical agents.

Plaintiffs response: Plaintiff did fully comply to strip search procedures throughout all applications of chemical agents but defendants sadistically and maliciously said plaintiff did not so chemical agents could purposely and forcefully be deployed on plaintiff to cause him pain.

The evidence shows: The handheld video (Exhibit one) shows plaintiff complying to all strip search procedures and going through the motions of taking off underwear, bending over, opening his mouth etc..

Supporting exhibits: Exhibit one video shows plaintiffs compliance to strip search procedures through all 3 applications of chemical agents.

Why this creates a factual dispute: This creates a factual dispute because defendants claim plaintiff did not comply to strip search procedures but video evidence (Exh. 1) supports plaintiffs claim of complying to all strip search procedures. If defendants had accepted plaintiffs compliance and had not forced application of chemical agents this incident would have not escalated to a cell extraction and this incident would have potentially been over.

4. Defendants argue: Prior to cell extraction plaintiff was awarded the opportunity to comply to strip search again but defendants claim plaintiff refused.

Plaintiff Response: Plaintiff fully complied with strip search procedures just seconds before extraction was forced and occurred.

The evidence shows: Video evidence (Exh. 2) shows plaintiff full compliance to strip search procedures just seconds before the cell extraction sadistically, maliciously, and forcefully occurs. When plaintiff get to the last part of the strip search which is showing the bottom of his feet. Plaintiff shows his bottom of feet but view is obstructed by the cell door and defendants sadistically and maliciously said plaintiff didn't fully comply and forced the extraction.

Supporting exhibits: Exhibit 2 clearly shows plaintiff fully comply with strip search procedures moments before the forced cell extraction. Exh. 2 video shows plaintiff say "yes sir" when asked if he would comply and proceed with full compliance of the entire strip search.

Why this creates a factual dispute: This creates a factual dispute because again defendants and plaintiffs argument of complying with strip search procedures contradict each other which led to forced cell extraction, sexual assault, abuse, and injuries.

5. Defendants argue: Plaintiff possibly was in possession of a weapon.

Plaintiff response: Plaintiff never had a weapon nor does plaintiff have any history of using or possessing weapons.

3

The evidence shows: There is no evidence of any weapon. Plaintiff was never in possession of a weapon.

Supporting exhibits: Exh. 1, 2, 3, 4, 5 all video evidence does not show any weapon being retrieved from plaintiff's cell or from plaintiff's possession. Exh. 14-19 defendants' incident reports also do not mention any findings of any weapons, use of a weapon, or weapon in plaintiff's possession.

Why this creates a dispute: This creates a factual dispute because if plaintiff would have had a weapon he could be deemed dangerous but plaintiff never had any weapons. There is no evidence of a weapon so the assumption of plaintiff being dangerous and having a weapon was false. Plaintiff was compliant, had no weapon, and had no history of violence to come up with that conclusion.

6. Defendants argue: During the cell extraction defendants claim plaintiff was resisting and keeping his arms and hands under himself preventing defendants from applying restraints.

Plaintiff's response: Plaintiff did not resist or keep his hands under himself at any time.

The evidence shows: Exhibit 2 handheld video shows that during the extraction plaintiff was barely moving, there are no signs or evidence of resisting. The defendants are all yelling "stop resisting" "give me your hands" throughout the extraction to muffle the sounds of punching, hitting, and assaulting the plaintiff while he is face down on the ground. Exhibit 6 picture of plaintiffs hands are not in color but is labeled bruising. The plaintiff used his hands briefly to block the punching and hitting to his head. This is why plaintiffs hands were purple and bruised and at no time under his body. Exhibit 6 defendant Shepard incident report states that plaintiff was resisting by actively kicking his legs and feet in various directions and yanking them away. Exhibit 17 defendant Wilson incident report states plaintiff was resisting by kicking his legs out and snatching them from his grasp. Exhibit 2 video does not support defendants Wilsons or Shepard's claims or incident reports of plaintiffs resisting. Please see page 10 in defendant's summary judgment. The section that says "The last two officers Sheppard and Wilson are steady as they are holding plaintiffs feet." This is a contradiction of Wilsons and Shepards incident reports.

Supporting exhibits: Exhibit 2 handheld video shows plaintiff barely moving during cell extraction. Exh audio sounds of plaintiff screaming in pain and sounds that are consistent of punching or hitting. Exh 2 clear view of plaintiffs legs showing no kicking and resisting in

various directions. Exh 16-17 defendants shepard and Wilsons incident report describing plaintiffs resisting compared to Exh 2 video and page 10 summary of judgment shepard and Wilsons statements are contradicting.

Why this creates a factual dispute: This creates a factual dispute because plaintiffs and defendants versions of events contradict each other and supporting exhibits do not support defendants resisting claim against plaintiff during extraction.

7. Defendants argue: There was no blood visualized on the rear of plaintiff's underwear on handheld video Exh 2 from the time plaintiff was escorted to the contamination shower and immediately after the contamination shower.

Plaintiff's response: Plaintiff was beaten and sexually assaulted, an unknown object or finger penetrated the plaintiff's rectum. From the time the plaintiff was sexually assaulted to being escorted to the contamination shower no more than 30 seconds had lapsed. Plaintiff suffered internal bleeding and injury as a result of the sexual assault, it is not uncommon to not see blood immediately after someone suffers from internal trauma, injury, or bleeding. After the contamination shower defendants do a 360 view with camera around plaintiff with new underwear on, there is no blood on rear of plaintiff's underwear. This is also not uncommon plaintiff was forced to wash all chemical agents off in shower if any blood was present then it would have been washed off too. Plaintiff suffered from an internal bleeding injury not external it is normal not to see immediate blood. From the time plaintiff stepped out of the contamination shower to the time plaintiff arrived to Shands Hospital, plaintiff was shackled and restrained and supervised. A physical sexual assault kit and exam was conducted by a doctor, chaperone, 2 nurses, and victim advocate. A significant amount of blood around the plaintiff's anus and rear of boxers was discovered. Bloody DNA swabs were collected and sent to FDLE. The time that had past from the extraction to the time plaintiff received the sexual assault exam at the hospital and the amount of blood that was discovered is consistent with someone who suffered internal bleeding due to sexual assault.

The evidence shows: A picture of plaintiff's rear side of underwear with a significant amount of blood around the anus. Medical records from Shands discovering bloody boxers around the anus and bloody DNA swabs that were sent to FDLE, and plaintiff's sworn declaration of sexual assault and abuse.

Supporting exhibits: Exh 6 shows a picture of bloody underwear on plaintiff's rear side only around anus. Exh 7 Hospital records showing plaintiffs injuries. Exh 11 grievances and complaints and declaration of plaintiff's sexual assault and abuse.

Why this creates a factual dispute: This creates a factual dispute because plaintiff claims the blood discovered around his anus and on his underwear comes from internal bleeding and the sexual assault during the extraction. The defendants propose the blood discovered on plaintiff underwear around anus is from soiling of the underwear or from a single non bleeding hemorrhoid visualized at the sexual assault exam.

8. Defendants argue: Defendants Arnette and Milleson argue that plaintiff did not announce and proclaim abuse and sexual assault until he was taken to be seen by medical.

Plaintiff's response: Plaintiff immediately reported abuse, sexual assault, and PREA allegations to handheld video camera within 15 seconds that it took to escort plaintiff after the extraction from plaintiff's cell to the contaminations shower.

The evidence shows: Plaintiff is being escorted to the contamination shower immediately after the extraction and plaintiff loudly and clearly declared that he was abused, sexually assaulted, and announced PREA to the handheld camera, defendants, and specifically Milleson and Arnette.

Defendant Milleson comes to plaintiff in front of contamination shower and states to plaintiff that filing false PREA allegations is a federal offense. Then plaintiff announced PREA multiple more times to camera.

Supporting exhibits: Exhibit 2 handheld video and audio clearly shows and you can hear plaintiff state he was abused, sexually assaulted, and declared PREA to camera and Defendants immediately when getting to the contamination shower. Exhibit 5 fixed wing camera also supports the same as exhibit 2 evidence. Defendant's summary judgment pg. 7 states "PREA is mentioned for the first time in shower."

Why this creates a factual dispute: This creates a factual dispute because Defendant Milleson and Arnette were the supervisors of this incident. The defendants claim in plaintiff's interrogatories, please see Exh 21 question and response #7 and Exh 23 question and response #7, that plaintiff did not announce abuse, sexual assault, or PREA allegations until; later upon being seen by medical. The plaintiff was made to take a contamination shower and the defendants were in direct violation of FDC policy for giving a sexual assault or PREA victim a

shower subjecting the plaintiff to destroying very important DNA evidence by taking a decontamination shower. Defendants Arnette and Milleson are trying to avoid liability by saying plaintiff made allegations not until seeing medical or not recalling hearing plaintiff make above mentioned allegations. The plaintiff's version of events and supporting exhibits contradict the defendant's supervisors Milleson and Arnette of when plaintiff reported sexual assault and abuse.

9. Defendants argue: That plaintiff refused a digital rectal exam at Shands hospital.

Plaintiff's response: At Shands hospital plaintiff was given 2 options for the sexual assault exam. The first option was by digital rectal exam which a doctor would have to insert a small camera or object into plaintiff's rectum to get best results. The other option was a physical rectal exam by doctor, chaperone, 2 nurses, and victim advocate. Due to the severe pain the plaintiff was already suffering from in his rectum from the sexual assault and feeling humiliated, ashamed, and embarrassed, the plaintiff chose to do as physical rectal exam.

The evidence shows: The plaintiff received a full sexual assault examination at Shands hospital. Bloody DNA swabs were collected and bloody underwear were all sent to FDLE. Pictures and sexual assault diagram were also taken and conducted. The medical records from Shands says that there are no OBVIOUS tears or fissures but would need further examination from digital rectal exam. There is absolutely no medical records or evidence that state that plaintiff does NOT have any tears or fissures in his rectum. There was a significant amount of blood found around plaintiff's anus and boxers which indicates clearly there was internal injury.

Supporting exhibits: Exhibit 7 Shands medical records of plaintiffs injuries shows that plaintiff deferred a digital rectal examination per patients preference but a full physical sexual assault exam was still conducted.

Why this creates a factual dispute: This creates a factual dispute because in defendants summary judgment defendants claim plaintiff refused a digital rectal exam. The plaintiff was given more than one option for a sexual assault exam, due to the pain the plaintiff was experiencing and being embarrassed. The plaintiff elected his second option which was to have a physical rectal exam by doctor, chaperone, 2 nurses, and victim advocate.

<u>Factual Allegations</u>

1. On October 9, 2022 plaintiff was located at RMC, an institution within the state penal system administered by FDC, where he was housed in K dormitory, wing 2.

7

2. That morning, sometime after 1:00 A.M., plaintiff was awoken by officer Hunt. Plaintiff previously had a verbal dispute with officer Hunt, who had come to plaintiff's cell that morning to conduct a retaliatory strip search.

3. Officer Hunt told plaintiff to strip down and bend over. Concerned for his safety, plaintiff asked officer Hunt why he needed him to strip down. Plaintiff then wanted and requested officer Hunt to get a Lieutenant.

4. Officer Hunt returned several minutes later with Lieutenant Arnette and captain Milleson. Sergeants Sheppard and Kirchner, and Officers Hunt, Wilson, Cavazos, and McDowell were also present outside plaintiff's cell.

5. Captain Milleson ordered plaintiff to strip, bend over and cough. Plaintiff complied. He removed his clothing and underwear and placed all his clothing in the slot in his door, as is required. He then bent over, squatted, and coughed. At no time during these events had any of the officers suspected plaintiff of hiding any objects or substances in his rectum. Instead, the entire spectacle was designed to humiliate, degrade and demean plaintiff.

6. Captain Milleson then falsely proclaimed that plaintiff had not complied with his orders. He ordered officer McDowell – who had seen plaintiff comply – to administer chemical agents (oleoresin capsicum spray) on plaintiff. Despite knowing that plaintiff had complied and that the strip search was not being done for penological purposes one of the other defendants on the scene opened the cell door and held a shield  in the entry way while officer McDowell administering the spray into plaintiff's face, holding the canister just above the shield. After administering the spray into plaintiff's face, the officers backed away and shut the door.

7. Plaintiff then began to put his underwear back on and get dressed. Plaintiff was visibly in pain from the chemical agents.

8. Captain Milleson then ordered plaintiff to strip again. Plaintiff complied. He removed the clothes he had begun putting back on and placed them in the slot. Like the first time, there was no basis to this second time for captain Milleson to order plaintiff to strip and bend over. Captain Milleson, his superior officer ,lieutenant Arnette, and their subordinate officers continued to force plaintiff – unlawfully, sadistically, maliciously, and for no penological purpose – to remove all his clothes and bend over solely to punish, demean and humiliate him.

9. Captain Milleson again falsely announced that plaintiff had not complied with his orders. He ordered his subordinates – who knew that there was no basis to use force on plaintiff

8

– to again administer chemical agents on plaintiff. One of the defendants and officer McDowell entered the cell with the shield and sprayed plaintiff again. They then shut the door.

10. Although in pain from the administration of chemical agents, plaintiff again began to get dressed to cover his naked body.

11. For a third time Captain Milleson ordered plaintiff to strip. Plaintiff complied. He was again falsely told by Captain Milleson that he had not complied and one of the defendants opened his cell door and held the shield while officer McDowell administered CS gas on plaintiff.

12. All defendants were on scene for these three chemical agent attacks, and each knew that there was no basis for ordering plaintiff to strip or for deploying chemical agents into his cell and into his face.

13. All defendants purposely did not record through all the applications and administrations of chemical agents or any of these events, in violation of FDC policy. They did so because they were not acting lawfully but were instead punishing plaintiff for previous run-ins and humiliating him.

14. At that time, lieutenant Arnette and Captain Milleson received approval; to engage in a forced cell extraction of plaintiff, despite knowing that there was no basis to go into plaintiff's cell and that he had complied each time they ordered him to strip down, even though there was no penological reason for the strip searches.

15. When an inmate continues to remain noncompliant with lawful orders, a team of officers will, with approval, enter the cell with shields and protective gear to force the inmate to comply or submit to restraints. At all times material, plaintiff had complied with all orders given to him and there was no basis to go into his cell for an extraction.

16. Plaintiff was in excruciating pain at this point, but again began to put on his underwear to cover his naked body, which was on display to the defendants, who were humiliating him by treating him like a circus animal.

17. As the cell extraction team composed of sergeants Sheppard and Kirchner, and officers Wilson, Hunt, Cavazos (collectively, "CET Defendants") entered his cell, plaintiff was in the process of putting on his underwear and laying face down on the ground.

18. These handheld cameras are held out of the cell in the hall and often do not capture what happens once the inmate is taken to the ground, which is the case here.

9

19. As the FDC inspector general noted in her PREA Investigative Report, the distance of the camera and the officer's movements in the cell near plaintiff's lower extremities precluded a clear view of what was happening on the ground.

20. What happened is as follows: CET defendants began to beat plaintiff after he was struck from behind by Defendant with shield while in process of laying face down, taking him to the ground where they continued their attack, while Captain Milleson and Lieutenant Arnette watched for their own gratuitous pleasure and also obstructed handheld camcorders view of plaintiff through most of the extraction. Plaintiff's face, eyes, and body were beaten, causing abrasion, bruising, and swelling.

21. While face-first on the ground, CET defendants applied hand and leg restraints. During that time, CET defendants continued to beat plaintiff, causing abrasions, and one of CET defendants penetrated plaintiff's rectum with a finger or object, sexually assaulting him for the purpose of humiliating, degrading, and demeaning plaintiff.

22. Plaintiff could feel what he later described as a "scratching, stabbing, and pounding" of his rectal area.

23. CET defendants then exited plaintiff's cell.

24. After exiting his cell, the defendants made light about what they did to plaintiff, joking that he had a "fist in his booty hole."

25. Continuing to diminish what happened, Captain Milleson later wrote that in his post-use-of-force incident report, even though plaintiff never used that language to describe event:

> DETAILS OF INCIDENT: On Sunday October 9th, 2022, while I was assigned to RMC Main Unit First Shift Supervisor I was overseeing the Post Used of Force procedures when Inmate XXXXXXXX DC#XXXXXX made PREA Allegations against the Forced Cell Extraction Team stating "One of them stuck their fist in my bootyhole." Inmate XXXXXX was immediately escorted to RMC Urgent Care following his decontamination shower.

26. Plaintiff was taken to a shower to treat his exposure to chemical agents, where he declared on camera that he was violated by one of the CET defendants.

27. Plaintiff was taken to Shands Hospital in Gainesville, Florida for treatment and evaluation.

10

## Background

1. Defendant Lt. Aaron Arnette is a lieutenant at Lake Butler RMC. The defendant has been sued previously due to negligence, please see Exh 21 Question and answer # 16 and also Question and answer #14.

2. Defendant officer Christopher Hunt is a correctional officer at Lake Butler RMC since 2021. The defendant has history of battery and fighting convictions please see Exh 24 Question and answer # 17. This defendant is the aggressor in plaintiffs claim.

3. Defendant Lt. Sheppard is a Lieutenant at Lake Butler RMC and has been employed with FDC since 2018. The defendant has been sued previously due to negligence please see EXH 22 questions and answer # 16.

4. Defendant Officer Milleson is a correctional officer at Union correctional Inst. And has been employed by FDC since 2013-14 . the defendant has been demoted due to negligence please see Exh 23 question and response # 5.

## Video Evidence

Defendants only provide video evidence that starts at around 1:59 A.M.. Handheld camera does not display time or date and there is undisclosed missing video recording that has been confirmed by the Inspector general's Office please see Exh 13. Defendants claim that plaintiff was causing a disturbance after midnight kicking, screaming, and banging objects against the cell door. There is absolutely NO evidence or video recording that supports the defendant's allegations of plaintiff causing any disturbance after midnight all the way up to 1:59 A.M.. After reviewing the video evidence submitted by the defendants, I examined the fixed wing video referenced in their motion. The footage begins at the moment chemical agents were deployed and does not include any of the events leading up to the disturbance. Specifically video evidence does not show defendant officer Hunt come to plaintiff's cell door at around 1:30 A.M.. Bang on Plaintiffs cell door wake up plaintiff out of his sleep with retaliatory intentions threaten plaintiff that he would beat his ass and to submit to strip procedures and hands restraints. The video evidence provided also doesn't show when Capt. Milleson, Lt. Arnette, and Hunt come back to maliciously and sadistically make plaintiff strip down numerous times, threaten and humiliate him. after plaintiff is in distress and in fear of the defendant's threats and intimidations is when video recording starts which is at 1:59 A.M.. The video evidence submitted by defendants does not show the circumstances that preceded the use of chemical spray or the cell

12

extraction. Almost 2 hours of relevant video evidence is being withheld by the defendants, in addition to this the fixed wing camera view of plaintiff's cell side is blurry and video view is not clear. Handheld video camera Exh 1 starts with defendants come to plaintiff's cell and ask plaintiff to comply with strip search procedures plaintiff complies which is shown on video but defendants say plaintiff didn't comply so defendants open plaintiffs cell door and spray plaintiff in the face with chemical spray and shut the door. Plaintiff is seen in pain and distress. The defendants leave and come back asking plaintiff to comply to strip search procedures again plaintiff does exactly that and complies but defendants maliciously and sadistically say plaintiff didn't on camera to force another application of chemical spray. Defendants open plaintiff cell door and spray again plaintiff is seen using his mattress to block chemical spray from hitting his face then defendants shut the door. Throughout Exh 1 plaintiff is seen putting papers briefly on cell window in fear defendants would sneak attack him while plaintiff was trying to wash the chemical agents off his face and body in his cell toilet. A defendant in Exh 1 during the chemical spraying is seen come to plaintiff's cell front and telling plaintiff to take off the papers off his cell window and once again plaintiff is seen complying to the defendant's orders and seen on video taking the paper off his cell window.

Defendant's come back to Plaintiff's cell front for the 3rd time, they ask plaintiff to strip down and ask plaintiff if he has a weapon plaintiff tells one of the defendants "No" when asked if he has a weapon and attempts to comply to strip search procedures but defendants continue to sadistically and maliciously say plaintiff is not complying. Plaintiff's cell door is than opened and breached and Defendant sprays another application of chemical gas into plaintiff's cell where he attempts to block the gas from hitting his face with his mattress then the cell door is closed. After the 3rd application of gas the defendants all leave and go put on their protective gear, helmets, shield, leg shackles, and handcuffs and get ready for a cell extraction.

Defendants return again with protective and extraction gear on this time. They ask plaintiff to submit to strip search procedures, Please see Exh. 2 video evidence. Exh. 2 clearly shows hat plaintiff is complying throughout the entire strip search. When the defendant gets to the part where they ask plaintiff to show them the bottom of his feet plaintiff complies but defendants sadistically and maliciously say plaintiff is not on video and then you can hear plaintiff "I am" on video and defendants say, "No you're not." Then while plaintiff is in the process of putting his underwear on and attempting to lay face down on the cell floor Lt. Arnette

opens the cell door and the extraction team is seen entering the cell. Defendant Kirchner is then seen striking the plaintiff from behind and jumping on him while plaintiff was already in laying down position and no threat to anyone. After the defendants enter the cell immediately, Lt. Arnette and Milleson are seen at the cell obstructing the camera's view from being able to catch the assault on plaintiff, blocking the view of assault.

Defendants are heard yelling, "stop resisting" throughout the entire extraction but video Exh. 2 does not show plaintiff resisting at all. During the extraction video Exh. 2, Defendants Sheppard and Wilson who are in charge of handling the plaintiff's lower extremities in the extraction are seen on video simply holding down plaintiff's legs with full control and very little movement. Throughout the extraction you can hear the plaintiff screaming in pain and agony "you're breaking my neck" "please stop help me". Exh. 2 video and audio while plaintiff is screaming you can clearly hear sounds that are consistent with sounds of punching or hitting. At the end of the extraction defendants Milleson and Arnette are heard saying shackles and cuffs on and defendants immediately pulling plaintiff to his feet and taking him out his cell for a contamination shower. It should be noted that when Lt. Arnett and Milleson say "cuffs and shackles on" Exh. 2 video and audio does not show and you can "not" hear anything that sounds like handcuffs or shackles being applied or any sound consistent of that nature. Which indicates that cuffs and shackles were already on prior to defendants saying on video "cuffs and shackles on." Defendants are then seen taking plaintiff to the contamination shower where plaintiff immediately reports abuse, assault and PREA loudly and clearly on video then Milleson comes up to plaintiff shower and tells plaintiff that making false PREA allegations is a federal offense. Plaintiff then continues to report to the camera what the defendants did to him. Throughout the rest of Exh. 2, plaintiff is seen complying and following orders but defendants Milleson and Arnette still order plaintiff to be restrained into a escort chair even when camera captures plaintiffs full compliance. The defendants do a full 360-body view with the camera of plaintiff, which show redness and scratches around underwear and back area but no blood on underwear, which is normal and consistent with someone who was just sexually assaulted and abused, given a contamination shower and suffering from internal trauma and bleeding. Exh. 3 video shows plaintiff being full restrained in shackles, escorted to the Infirmary to be medically checked. Plaintiff is seen on camera asking for help and telling the nurses what the defendants did to him.

14

## DEFENDANTS CONTRADICTING STATEMENTS

1.      Defendant Lisa McDowell incident report (Exh. 26) and camera operator Bryan Combs Incident Report (Exh. 18) of when incident occurred is contradicting of all other defendants reported time of incident on their incident reports.

2.      Camera operator Bryan Combs states please see Exh. 18 that shortly before Captain Milleson returned with the extraction team the handheld camera had malfunctioned and ceased recording. Immediately Ofc. Combs notified Milleson of the malfunction upon the return of Milleson and extraction team. Capt. Milleson is seen on video Exh. 2 during the contamination shower process stating that he was just notified by the camera operator that video ceased recording, Ofc. Combs incident report contradicts what Captain Milleson says on video Exh. 2 during contamination shower process of when he was notified of a camera malfunction. Captain Milleson claims on video Exh. 2 that he wasn't notified until after the cell extraction.

3.      Defendants Wilson and Sheppard claim plaintiff was resisting by kicking his legs and snatching them from their grasp during the cell extraction. Exh. 2 video shows otherwise.

4.      Defendant Arnett claims please see (Exh. 21 – question and answer #7). Lt. Arnett doesn't recall when plaintiff made PREA allegations but video Exh. 2 clearly shows plaintiff making PREA allegations and video also shows Arnette in the area of when allegations were made.

5.      Defendant Milleson claims (please see Exh. 23 – question and answer response #7). That plaintiff did not report sexual assault or abuse until he was seen by medical. This is a complete contradictment to what video Exh. 2 shows. The plaintiff is heard and seen making the PREA allegations on video during the contamination shower process, and most importantly before being seen by medical.

6.      The defendants claim that during the plaintiff's transport to Shands Hospital the plaintiff didn't make complaints of any wrongdoing. This is also a contradiction plaintiff is heard telling Milleson and other defendants that the ankle restraints were on too tight and that his ankles were bleeding. Please see Exh. 3 – video.

7.      Defendants claim plaintiff destroyed Fire Sprinkler (State Property). There is absolutely no evidence of anything being destroyed, "Fire Sprinkler," pictures of destroyed fire sprinkler, disciplinary report for destruction of state property or receipt or documentation of plaintiff being charged for broken fire sprinkler. Exh. 2 video does show water coming out of plaintiff's cell

15

which is consistent with a fire sprinkler being active or deployed. The fire sprinkler in plaintiff's cell was 100% functional and never destroyed.

8.      Defendants claim that during the cell extraction while plaintiff was on the ground face down he somehow lunged forward and bit Ofc. Cavazos on his right hand. This is a contradiction, please see Exh. 5 – fixed wing video. Ofc. Cavazaos throughout Exh. 5 in no sign of distress, pain, or injury. There is clear view of Cavazos and there is no tear or rip in his gloves. There is no report of injury on video for Cavazos, and right before Exh. 5 ends you can see him moving and swaying his arms and hands freely with no issues or problems. In addition to this, DNA Swabs were collected of plaintiff's mouth and was negative for anyone else's DNA. It should also be noted that plaintiff offered a bite impression to the General Inspector's Investigator to compare to any evidence provided to support this allegation.

1)      CONSTITUTIONAL RIGHT VIOLATED:

The defendants violated my constitutional right under the 8th Amendment by using excessive force, causing serious injury, sexual assault, deliberate indifference to medical needs, and retaliation.

2)      Legal Rule / Supporting Authority:

The law clearly states that excessive force is unconstitutional when it is used maliciously and sadistically to cause harm.

3)      How Defendants Violated that Right:

On 10/09/2022 Defendant Lisa McDowell repeatedly administered chemical agent despite Plaintiff's compliance with orders. She violated that right by acting maliciously and sadistically causing plaintiff harm. Lisa McDowell used force on Plaintiff force on Plaintiff without any legitimate need to maintain or restore discipline or for any good faith reason. Despite Plaintiff's compliance, McDowell, at her superior officer's instruction, administered chemical agents directed at the plaintiff's face. Her conduct was motivated by evil intent to harm and torment plaintiff by callous or reckless indifference to his right to be free from excessive force.

On 10/9/2022 Defendants Sheppard, Kirchner, Wilson, Hunt, and Cavazos violated the Eighth Amendment when they gratuitously beat plaintiff, including while compliant and restrained. They violated that right by acting maliciously and sadistically to cause plaintiff harm. The CET Defendants used force without any legitimate need to maintain or restore discipline or

16

for any good faith reason. Despite Plaintiff's compliance, CET defendants, at their superior officer's instruction, attacked Plaintiff. Their conduct was motivated by evil intent to harm and torment plaintiff by callous or reckless indifference to his right to be free from excessive force.

On the date of 10/9/2022 Defendants Sergeants Sheppard, and Kirchner, and Officers Wilson, Hunt, and Cavazos violated the Eighth Amendment when they penetrated Plaintiff's rectum with a finger or object. They violated that right by maliciously and sadistically with a sufficiently culpable state of mind as to cause harm Plaintiff. The CET Defendants used force on Plaintiff without any legitimate need to maintain or restore discipline or for any good faith reason. In fact, sexual assault can never serve any valid penological purpose under clearly established law, nor is it ever acceptable under contemporary standards of decency

On the date of 10/9/2022 Defendants Lt. Arnette and Capt. Milleson maintain a senior rank and supervisory authority over CET Defendants and Officer Lisa McDowell. Arnette and Milleson, as the ranking officers on the scene, ordered and directed CET Defendants and Officer Lisa McDowell their subordinates, to act unlawfully. Specifically Arnette and Milleson ordered Officer Lisa McDowell to administer chemical agents and other Defendants to raid Plaintiff's cell and attack him despite his compliance, all in violation of the 8th Amendment and clearly established law. McDowell and the CET Defendants followed the unconstitutional directives, administered chemical agents, beat, and attacked Plaintiff, including sexually assaulting him, while he was restrained in his cell. Arnette's and Milleson's unconstitutional orders were motivated by evil intent to harm plaintiff by callous or reckless indifference to his right to be free from excessive force.

All defendants for their respective failure to intervene to stop each subsequent actor, or for the CET Defendants, their failure to stop their respective team members from gratuitously using farce and sexually assaulting plaintiff. Defendants, while acting under color of State law, unlawfully and without justification jointly and severally violated the Eighth Amendment when they observed each of the others, while acting under color of state law, commit extreme physical violence on Plaintiff while he was compliant and while he was restrained. As a direct and proximate result of failure to intervene, Plaintiff sustained brutal and severe physical and mental injuries.

4)      Evidence Showing the Violation:

The following evidence supports my claim:

17

Exhibit 1-4 handheld video shows Plaintiff's full compliance throughout all strip search procedures and Plaintiff fully complying to all orders form after the extraction all the way to returning from Shands Hospital.

Exhibit 5-Fixed wing camera shows time of recording starts at 1:59 A.M. almost 2 hours after Defendants alleged Plaintiff was causing a disturbance.

Exhibits 1-4- has undisclosed missing video and there is no display of exact time or date.

Exhibit 18- Officer Comb's incident report states video hand held ceased recording.

Exhibit 13- Inspector General's notes of policy violations.

Exhibit 6- pictures of plaintiffs injuries from Shands Hospital (Blood around anus in boxers).

Exhibit 7- Shands Medical records shows Plaintiff's rectal bleeding, extensive facial swelling and bruising, abrasions, cuts, scratches, hemorrhage of eye, hematoma in the face. Throughout the 15 pages of records provided the plaintiff's medical records consistently say that plaintiff suffered from physical assault, facial trauma, pg. 40 Bruising head marks from handcuffs and ankle cuffs which indicates plaintiff was hit and restraints on to tight. CT Thoracic and lumbosacral spine was compromised please see pg. 21. Please see pg. 26 Radiology indications comment: Strangulation, pg. 6 red linear scratch marks across patient's body arms, back, buttock, cont....

Exhibit 7 supports plaintiff's claim of being brutally beaten and sexually assaulted and also strangled. It also shows clear evidence of plaintiff trying to use his hands and arms to temporarily block defendant's assault on him, which is why plaintiff suffered from so many abrasions, bruising, and scratches to both his arms and hands.

Exhibit 8 is 35 pages of plaintiff's medical record from FDC medical providers who plaintiff was treated by after this incident for the very serious injuries and medical conditions plaintiff suffered from as a result of this incident, please see pg. 549, 550, 554, and eye glasses receipt from optometrist. Plaintiff suffered from vision loss and was tested due to being punched and eye gouged during this incident. Plaintiff also was diagnosed with chronic posttraumatic stress syndrome, anxiety, depression, and severe paranoia, by Mental Health Doctor Anthony and Union C.I. after plaintiff was emergency transferred from Lake Butler Trauma Care Unit after this incident. Plaintiff is currently taking 20 mg of Paxil, Melatonin, and Trileptol to deal with all his mental health conditions. Plaintiff has been taking mental health medications for almost 3 years to help cope with the injuries due to this incident. Since this incident plaintiff has

18

suffered from seizures between 21-24 seizures to this present day the first one occurring in October 27, 2022. There are numerous documents, sick call requests, medical requests, Neurologist evaluations by Dr. Sabrina Christian that plaintiff has been suffering from seizures since this incident occurred. Plaintiff had no prior history of seizures and after plaintiff's last visit with the neurologist plaintiff was found to have severe seizure activity and has been prescribed to take 500 mg of Kepra twice a day. Plaintiff still to this day suffers from seizures and recently hospitalized for having a seizure fracturing his skull, breaking his right thumb, and having a severe spinal injury. This incident and the serious injuries plaintiff suffered and still suffers from has had a domino effect on plaintiff's ongoing declining health.

Exhibit 9 are documents that are from outside entities, lawyers, family members, making complaints and requests seeking information about plaintiff's ongoing seizures and mental health issues due to this incident. This evidence helps support plaintiff's claim because it shows other parties concerns of plaintiff's ongoing seizures since this incident.

Exhibit 10 are multiple grievances plaintiff filed about having seizures and seeking help/ This evidence helps support plaintiffs claim of having seizures which is a result of injury due to this incident.

Exhibit 11 is numerous grievances submitted by the plaintiff immediately after the incident occurred. Its multiple sworn declarations, requests, and pleadings for help. These grievances explain what happened to plaintiff, the retaliation plaintiff was subjected to, being denied phone calls to report PREA, being denied access to get medical attention or help from anyone. Being denied for requesting preservation of video to preserve evidence of this incident. This evidence is critical in supporting plaintiffs claim because its immediate complaints after this incident occurred and it shows the struggles and retaliation plaintiff had dealt with. This evidence shows that plaintiff did not receive any help after this incident occurred for some time. The trauma and stress and continuous retaliation led to plaintiff being admitted into Lake Butler's Trauma Care Unit and then emergency transferred to Union C.I. Mental Health Unit.

Medical records showing: Plaintiff suffered physical assault, trauma, and sexual assault. As a result of the injuries medical records show plaintiff has neurological abnormalities, seizures, vision loss, chronic PTSD, depression, anxiety, and serious mental health conditions. There is medical evidence of the spine being compromised and also knee infusion and arm and joint complications.

19

Grievances filed on Multiple grievances were filed from the date of 10-14-22 until months after incident.

5)         Why a jury could find for Plaintiff:

A reasonable jury could find in plaintiff's favor because the injuries match the plaintiff's account. A significant amount of blood was found on the rear of plaintiff's underwear and around his anus. There is no reasonable explanation for that amount of blood to be discovered and certainly the Defendants assumption of the plaintiff's underwear being soiled or that amount of blood came from a single non bleeding hemorrhoid should be for a reasonable jury to decide. All the other injuries extensive facial swelling, abrasions, cuts, scratches, hemorrhage in eye, vision loss, seizures, PTSD, Anxiety, depression, bulging disk, spinal complications, are consistent with someone who was brutally beaten and sexually assaulted. There are also officer's reports, statements, and stories that conflict specifically regarding when handheld video stopped recording, how much video evidence is missing, when plaintiff declared PREA, assault, and abuse, whether plaintiff was complying, or if the plaintiff was resisting during the extraction. Plaintiff's documents support his version of events, video and evidence submitted and sworn declaration has always stayed consistent. Most importantly, plaintiff has no control of submitting video evidence only Florida Department of Corrections does. The Defendants all claim plaintiff was a constant problem and was creating a disturbance after midnight. The video evidence submitted is time stamped at 1:59 a.m.. There is significant amount of video recording being withheld or was destroyed of this incident. I believe a reasonable jury will not find that to be a coincidence and could find for the plaintiff.

6)         Color of State Law:

Defendants acted under color of state law because they were on duty as correctional officers, in uniform, performing official duties at the time of this incident.

7)         Causation

Defendant's actions directly cause my injuries, including: rectal bleeding, extensive facial swelling, and hemorrhage in the left eye, abrasions, cuts, scratches and bruising throughout plaintiff's body. Bulging disk of spine, widening of the spinal canal, knee effusion , and arm pain and joint complications. Neurological abnormalities and very serious seizure condition, and vision loss. In addition to all of this plaintiff now suffers from very serious mental health issues such as chronic PTSD, depression, anxiety, which alone carry symptoms of their own,

20

flashbacks, nightmares, insomnia, cold sweats etc. Plaintiff now has to take multiple medications to assist pain, seizures, mental health conditions, and constant therapy. In doing the medical conditions and injuries sustained from this incident also caused plaintiff's declining health.

8)        Qualified Immunity Does Not Apply

Qualified immunity doesr not apply because:

The right to be free from Sexual Assault, Excessive force, causing serious injury, deliberate indifference to medical needs, and retaliation was clearly established.

No reasonable officer would believe this conduct was lawful.

The force and actions used were malicious, sadistic, and without justification.

ARGUMENTS:

1.    Sexual Assault by a correctional officer violates clearly established constitutional rights. Sexual Assault by a correctional officer constitutes cruel and unusual punishment under the 8th Amendment. Courts have consistently held that sexual abuse or coercive sexual acts by prison officials are unconstitutional and require no showing of physical injury to proceed. The eleventh circuit recognizes that such conduct is inherently excessive and malicious. Plaintiff's sworn account directly contradicts Defendants denial, creating a genuine dispute of material fact. No reasonable officer could believe such conduct lawful, defeating qualified immunity.

2.    Excessive Force Claims Cannot be Resolved On Summary Judgment.

The Eighth Amendment prohibits force applied "maliciously and sadistically for the very purpose of causing harm." Whether force was excessive is a fact intensive inquiry that cannot be resolved when the parties' accounts differ. Plaintiff's evidence shows that force was used without justification and caused harm. Defendant's version of events conflicts with plaintiff's, creating a credibility dispute that must be resolved by a jury.

3.    Retaliation for Exercising First Amendment Rights is Unconstitutional

Prison officials may not retaliate against an inmate for filing grievances, reporting misconduct, or exercising protected speech.

A retaliation claim requires showing protected conduct, an adverse action, and a casual connection. Plaintiff's evidence shows that adverse actions followed immediately after he reported misconduct. This temporal proximity, combined with the nature of the actions taken against him, creates a genuine dispute of material fact that precludes summary judgment.

4.    Deliberate Indifference to Serious Medical Needs Violates the Eighth Amendment.

21

Deliberate indifference occurs when officials know of and disregard a substantial risk of serious harm. Plaintiff's medical records, grievances, and declarations show that he requested adequate care. Defendant's assertions of proper treatment are contradicted by the record. These factual disputes must be resolved by a jury.

5.    Due Process Violations Arise When Officials INTERFERE with access to the courts

Prisoners have a constitutional right to access to the courts. Interference with grievances, withholding   documents, obstructing legal claims, or preventing evidence from being preserved violates due process. Plaintiff's evidence shows that Defendants actions hindered his ability to pursue legal remedies. These facts create a genuine dispute of material fact that defeats summary judgment.

6.    Destruction or concealment of Evidence supports Liability and Defeats Summary Judgment.

Intentional destruction, alteration, or concealment of evidence relevant to prisoner's legal claims violates due process and access to the courts rights. Plaintiff presents evidence that material evidence was destroyed or withheld. This directly contradicts Defendants assertions and creates a genuine dispute of material fact., such conduct, if proven, independently supports liability under § 1983.

## CONCLUSION:

The record contains multiple disputes of material fact regarding sexual assault, excessive force, retaliation, medical neglect, due process violations, and destruction of evidence. These disputes must be resolved by a jury. Defendants are not entitled to Judgment as a matter of law. Plaintiff respectfully requests that the courts deny defendants Motion for Summary Judgment in its entirety.

Signed: _Patrick Jasniak_

Patrick Jasniak,
Date: _6/18/26_
Respectfully submitted,

_____

Patrick Jasniak Pro se
DC# D11298
Charlotte Correctional Inst.
33123 Oil Well Road
Punta Gorda, Florida 33955

22

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing Response in Opposition to Defendant's Motion for Summary Judgment was placed in the institutional legal mail system, and addressed to counsel for Defendants on this 18 day of June 2026.

*Patrick Jasniak*

Patrick Jasniak

23